UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| TAMRA WELBIG,<br><br>　　　　Plaintiff,<br><br>-vs-<br><br>JORDAN HANSEN;<br>JORDAN McCASKILL; and<br>JUSTINA HILMOE,<br><br>　　　　Defendants. | CIV 15-4085<br><br>MEMORANDUM OPINION AND<br>ORDER DENYING PLAINTIFF'S<br>MOTION FOR NEW TRIAL AND<br>MOTION FOR<br>EVIDENTIARY HEARING |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The Plaintiff, Tamra Welbig, has filed a Motion for New Trial pursuant to Federal Rule of Civil Procedure 59 (doc. 65), and a Motion for Evidentiary Hearing Regarding Potential Juror Misconduct (doc. 82). Defendants Jordan Hansen, Jordan McCaskill and Justine Hilmoe oppose both motions. For the reasons stated below, the motions will be denied.

## BACKGROUND

On June 5, 2012, Welbig was arrested by Defendant police officers. In the course of the arrest, Welbig suffered injuries to her face and toe. Welbig alleges that Defendants violated 42 U.S.C. § 1983 by 1) conspiring to deprive her of her Fourth Amendment right to be free from unlawful arrest, 2) unlawfully arresting her in retaliation for exercising her First Amendment right to freedom of speech, 3) depriving her of her Fourth Amendment right to be free from the use of excessive force, and 4) using excessive force in retaliation for exercising her First Amendment right to freedom of speech. A jury trial was held from June 29, 2016 to July 1, 2016. The jury returned a verdict in favor of Defendants on all of Welbig's claims.

Welbig has now filed a Motion for New Trial. In support of her request for a new trial, Welbig argues that 1) the verdict was against the clear weight of the evidence, and 2) improper

character evidence was admitted into evidence and referenced by defense counsel in closing argument. In addition to her motion for new trial, Welbig has moved for an evidentiary hearing regarding potential juror misconduct, asserting that a juror may have presented extraneous information to the jury during deliberations.

## DISCUSSION

Federal Rule of Civil Procedure 59 states in relevant part:

(1) **Grounds for New Trial**. The court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows:

> (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court.

Fed.R.Civ.P. 59(a)(1)(A). Pursuant to Rule 59, the Court may grant a new trial when the first trial resulted in a miscarriage of justice, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial. *Trickey v. Kaman Indus. Technologies Corp.*, 705 F.3d 788, 807 (8th Cir. 2013). "With respect to legal errors, a 'miscarriage of justice' does not result whenever there are inaccuracies or errors at trial; instead, the party seeking a new trial must demonstrate that there was prejudicial error." *Id.* Whether or not to grant a new trial is almost entirely at the discretion of the trial court. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Tedder v. Am. Railcar Indus., Inc.*, 739 F.3d 1104, 1110 (8th Cir. 2014). The question is not whether the Court would have reached the same verdict on this evidence. "The key question is whether a new trial should have been granted to avoid a miscarriage of justice." *Michigan Millers Mut. Ins. Co. v. Asoyia, Inc.*, 793 F.3d 872, 878 (8th Cir. 2015) (citation omitted).

### A. New Trial Based on Sufficiency of the Evidence

"When reviewing a jury verdict to decide whether it is against the weight of the evidence, the district court conducts its own review of the evidence to determine whether a miscarriage of justice has occurred. However, the trial judge may not usurp the functions of the jury, which weighs the evidence and credibility of witnesses." *Boesing v. Spiess*, 540 F.3d 886, 890 (8th Cir. 2008) (internal citations and quotations omitted).

On this issue, Welbig focuses on her excessive force claim, which is against defendants Hansen and McCaskill only. According to her testimony, on the night of June 4, 2012, Welbig took a mixture of medications that had the effect of making her unable to function when she woke up on the morning of June 5, 2012. She asked her 13-year-old daughter, C.W., to find a neighbor in the apartment building where they lived who could drive her to the doctor. C.W.'s testimony supports Welbig's account that she had taken a mix of medications and could not dress herself or walk on her own. C.W. called Arlene Mathiesen, who tried to help Welbig out to the car. Mathiesen said that she and C.W. had to almost carry Welbig to Mathiesen's car and place her on the passenger side front seat. (Video Dep. 11:7-16.) Mathiesen, who had training and experience as a nurse, decided to call an ambulance for Welbig. She described Welbig's condition as they were waiting for the ambulance to arrive:

> A. I - by that time Tamra was unresponsive. I couldn't get her to talk to me. In fact, she was turning almost ashen, and I was scared. I was afraid I was losing her, and I slapped her.
>
> Q. All right. Let me ask you a little bit about that. Arlene, do you have any medical training in your background?
>
> A. Yes, I do.
>
> Q. What kind of training have you had? A I'm a retired LPN and –
>
> Q. That's a licensed practical nurse, correct?
>
> A. Yes. And ages ago I drove ambulance at Lake Norden.
>
> Q. Were you trained as an EMT in those days?
>
> A. Yes.
>
> Q. So you've been around people who are losing consciousness, who have substance problems, and that sort of thing?
>
> A. Yes.
>
> Q. And when you say you thought you were losing her, regarding Tamra, what do you mean?

A. I thought -- actually, I thought she was going to die just because the pulse was so slow and the way she was turning ashen and she wasn't responding at all.

Q. Were her eyes open?

A. No.

Q. And when you say responding, were you asking her questions?

A. I was asking her questions. I was trying to get her to talk to me.

Q. Did she verbalize anything at all?

A. No. Nothing.

Q. And then you slapped her?

A. Yes, I did.

Q. And with an open hand?

A. I believe so, yes.

Q. And your purpose in doing that was just to revive her or –

A. Yeah, to wake her up, to see if she was still with me.

Q. Did you have your cell phone with you then?

A. Yes.

Q. What did you do?

A. Well, in the hallway I had called 911, and I do not remember what C.W. said –

Q. Why did you call 911? Did you think you were unable to drive her yourself?

A. I thought she was getting worse and we needed an ambulance.

(Video Dep. 12: 5-25; 13:1-25.)

When dispatch alerted the ambulance service, the chief complaint was "possible overdose." (TT 337.) It is the practice that Brookings police officers respond to ambulance calls as well. (TT 338.) Jordan McCaskill and Monique Dorrow were the first officers on the scene after receiving a call for a possible overdose. (TT 276.) Mathiesen flagged McCaskill down and he found Welbig sitting in the passenger seat of the vehicle. (TT 276-77.) McCaskill testified that Welbig did not respond to him, and "[s]he looked tired, unresponsive, kind of slouched in the chair." (TT 278.) Officer Jordan Hansen arrived and he spoke to Welbig. (TT 279.) McCaskill described the encounter:

> Q. Well, what did you observe when Jordan Hansen talked to her, and what did you observe her response to be?
>
> A. It appeared that she became agitated by something, and she attempted to possibly get out of the vehicle. Kind of made a forward motion towards Officer Hansen, and that's when I noticed that his head moved backwards while her arm was coming forward.
>   That's when he must have made the reasonable belief that he was assaulted and became hands-on with Ms. Welbig.

(TT 279.) McCaskill testified further:

> Q. When you say Officer Hansen initiated physical contact, describe that for us and what happened.
>
> A. Once I saw his head move backwards and he must have made the determination that he was assaulted, he went ahead and went hands-on by grabbing her, I believe, rear shoulder, right shoulder possibly, and that's when he gained control of her, and I assisted him by placing her on the ground.

(TT 282.) McCaskill described the arm bar take-down that they decided to use to "gain control" of Welbig: "You gain control of the wrist, and with some application to the back side of their arm, you try and attempt to place them on the ground." (TT 284.) Welbig's arms were handcuffed behind her back. (TT 284-85.) Officers McCaskill and Hansen were able to stand her up, and they testified that they walked Welbig to the ambulance. (TT 285.)

5

Defendant Hansen testified that he knew Welbig from talking to her on other cases and thought he had a good rapport with her, so he attempted to talk to Welbig but was also unable to get a response from her. (TT 307.) When, however, Officer Dorrow said something about getting the pills from the possible overdose, according to Hansen, Welbig jumped out of the vehicle and started yelling expletives at Officer Dorrow. (TT 308.) Hansen said he thought Welbig "was jumping out of the vehicle to go after Officer Dorrow." (TT 309.) He tried to get Welbig to sit back down. (TT 309.) Hansen testified that Welbig's hand went back, a fist was being made, her arm came forward and Hansen realized she was going to hit him. (TT 310.) He turned his head and was struck but not injured. (TT 310.) Hansen described the process of taking Welbig to the ground where he could control her aggression or resistance better:

> A. As her arm came forward and I turned my head and struck me, I moved a little more off to the side, placed my hand on her shoulder, and moved my other hand on her arm to go into what they call the arm bar take-down.
> When you do that, you kind of roll and sweep off to the side. That will cause a person's center balance to be thrown off, and you do fall to the ground.
>
> Q. And that's what happened here?
>
> A. Yes.
>
> Q. Did you see her face bounce off the concrete?
>
> A. I don't recall her face bouncing off the concrete.
>
> Q. Then were you and Officer McCaskill able to put restraints on her?
>
> A. Yes.
>
> Q. What kind of restraints?
>
> A. Handcuffs.

(TT 312.) On the recording of the 911 call, officers stated that Welbig was fighting with them and that they had her on the ground. (Defendants' Ex. 217.) The takedown of Welbig occurred within about 30 seconds of Hansen's arrival on the scene. (TT 320.)

In addition to the officers' testimony, Defendants presented the testimony of Mathiesen, who was standing beside the front passenger door of the vehicle when the incident occurred. Mathiesen testified that when a female officer was walking toward the apartment with C.W., Welbig jumped out of the car and screamed profanities at the officers. (Video Dep. 17-19.) Welbig was "hitting out," "flailing her arms," and the officers tried to calm her but it did not work. (*Id.*) Mathiesen filled out a report to that effect right after the incident. The last couple of lines state: "Tammy got very violent and struck out at officers cursing at them. She fought officers and landed on the ground cutting the top of her nose." (Video Dep. 22 and Defendants' Exhibit 201.) (Defendant Hilmoe arrived on the scene when Mathiesen was completing her witness statement. (TT 236, 238.))

In contrast, Welbig testified that when she heard Officer Dorrow say she was going to take C.W. into her apartment, she tried to get up out of the seat but she couldn't lift herself, so instead she told officers Hansen and McCaskill that she did not give Dorrow permission to enter her apartment. (TT 123.) Welbig described what happened as she was attempting to lift herself up:

> Jordan McCaskill grabbed me by the shoulder. Jordan Hansen grabbed me by this one, and they yanked me up out of the Durango, and they had my hands behind my back, and they slammed me into the cement, and I felt my head bounce.
> Jordan Hansen said, "Give her a simple assault." They both got on top of me. I thought I was dead at first. Then I could feel the blood running down.
> Then they were arresting me, holding me down, and I seen the ambulance, and at the same time I seen Justina Hilmoe pull up in a pickup right in front of me.
> I thought, okay, the ambulance are going to get out, and they're going to come pick me up and put me on the bed so I don't have to hurt anymore. And they drug me to the ambulance, and they got me up. Then they put me in a chair, and then they left.

(TT 123-24.) Welbig also presented testimony from two witnesses, Tamara Schafnitz and Monica Tebeest, who lived on the second floor of same apartment complex as Welbig, and claimed to have seen the incident from their apartment windows. They testified that they did not see Welbig resist or attempt to strike officers. (TT 89, 105.) On cross-examination defense counsel pointed out some possible limitations on the views these witnesses had of the scene.

7

As indicated earlier, Welbig's insufficiency of the evidence argument relates solely to her excessive force claim against defendants Hansen and McCaskill. She points to the instruction that was given to the jury on excessive force:

### INSTRUCTION NO. 13

Plaintiff also claims that Officer Jordan Hansen and Officer Jordan McCasskill used excessive force when arresting Plaintiff. The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person. Moreover, officers are liable for the use of excessive force when they use force that is not objectively reasonable in light of the facts and circumstances confronting them. Your verdict must be for the Plaintiff and against Officers Hansen and McCaskill on Plaintiff's excessive force claim if all the following elements have been proved:

(1)   Officers Hansen and McCaskill forced Plaintiff to the ground while handcuffing her, causing her head to hit concrete;
(2)   The force used was excessive because it was not reasonably necessary to restrain Plaintiff; and
(3)   As a direct result, Plaintiff was injured.

You must determine the degree of force that a reasonable and prudent police officer would have applied in effecting the arrest under the circumstances shown from the evidence received in this case. In determining whether the defendant police officers used excessive force, you may consider:

1.   The extent of the injury suffered. To the degree the injury tends to show the amount and type of force used is also relevant to your determination of whether excessive force was used,

2.   The need for the application of force,

3.   The relationship between the need and the amount of forced used,

4.   The threat reasonably perceived by the responsible officials, and

5.   Whether a reasonable officer on the scene, without the benefit of hindsight, would have used that much force under similar circumstances.

In considering whether the use of force was reasonable, you should consider the totality of the circumstances, including the severity of the crime, the danger the suspect poses to the officer or others, and whether the suspect is actively resisting

> arrest or attempting to flee. You should bear in mind that the decision about how much force to use often must be made in circumstances that are tense, uncertain, and rapidly changing. You should further bear in mind that injuries resulting from, for example, an officer's use of force to overcome resistance to arrest does not involve constitutionally protected interests. The use of force by officers simply because a suspect is argumentative or contentious, however, is not to be condoned. Force can only be used to overcome physical resistance or threatened force.
>
> The reasonableness inquiry is an objective one. The question is whether Officers Hansen and McCaskill's actions were objectively reasonable in the light of the facts and circumstances confronting them, without regard to their own state of mind, intention, or motivation.
>
> If any one of the three elements I detailed moments ago has not been proved, then your verdict must be for the Defendants.

(Doc. 48, pp. 16-17.) It is the second element that is in dispute. Welbig asserts that the evidence at trial supports finding only that the force used was excessive because it was not reasonably necessary to restrain her.

In her brief, Welbig goes through each of the five factors listed in Instruction No. 13 for the jury to consider in determining whether excessive force was used. The first is the extent of the injury suffered. Welbig argues that what appeared to have been minor abrasions which might occur during any routine takedown was, in fact, a major injury, *i.e.*, a broken nose. Defendants point out that Welbig submitted no medical documentation to support her claim that she suffered a broken nose on June 5, 2012, and no medical witnesses testified on her behalf. The only medical witness who testified at trial is Wendy Long, the ambulance paramedic who treated Welbig at the scene and transported her to the hospital. Long testified about her observations of Welbig's injuries:

> Q. Did you observe anything about her person when you were assessing her in the ambulance?
>
> A. Yes. She had a few abrasions. She had an abrasion to the bridge of her nose, with bleeding controlled; an abrasion under her right eye, no bleeding with that; an abrasion to the top of her big toe on her left foot with no bleeding.

9

(TT 342.) The three abrasions did not require treatment. (TT 346.) Long testified that she has treated patients with a broken nose and normally sees it bleeding through the nostrils. (TT 352.) She was asked and gave further details about treating broken noses:

> Q. Well, how do you observe a broken nose when you've seen one due to impact?
>
> A. Usually there's swelling of the tissues around the nose and the face, the orbits of the eyes. Sometimes there's black eyes, too, depending on how hard the person's nose is broken.
>
> There's also -- there's bleeding usually along with that, either down the back of the throat or out the nares.
>
> Q. "Nares" being nostrils?
>
> A. Yes.
>
> Q. Did you notice any of those symptoms present on Miss Welbig when you examined her in the ambulance or transported her to the hospital?
>
> A. Not that I recall.

(TT 353.) Long also testified that Welbig was on the ground when Long arrived in the ambulance, and Long walked Welbig to the ambulance with the assistance of the officers. (TT 341, 344.) Additionally, Long asked Welbig why she was fighting with the police, and Welbig responded that she just wanted to go into her apartment. (TT 349.)

Welbig addresses the second, third and fourth considerations together in her brief,[1] arguing that there was "no reason to believe she was armed, dangerous, had committed any crime or presented any reasonable threat to two well-trained law-enforcement officers, over twice her size," who "with unrestrained force threw her to the ground." (Doc. 81 at 6.) Welbig's argument rests on the jury finding her and her witnesses more credible than the defendants and their witnesses. The jury plainly decided that the defense witnesses and their version of the events were more credible.

---

[1] These factors are: 1) the need for application of force, 2) the relationship between the need and the amount of force used, and 3) the threat reasonably perceived by the responsible officials. *See* Instruction No. 13.

Defendants presented sufficient evidence at trial for the jury to find that Hansen and McCaskill did not use excessive force. This Court concludes that the outcome was not against the great weight of the evidence so as to constitute a miscarriage of justice. Therefore, Welbig's motion for a new trial based on sufficiency of the evidence will be denied.

### B. New Trial for Improper Closing Argument

Welbig next takes issue with defense counsel's use of character evidence during closing argument. Welbig's argument is that counsel appealed to the passions of the jury and may have influenced the issue of liability by depicting Defendants "as unblemished heroes, steeped in community service and family values" through use of inadmissible character evidence. *See* Doc. 81 at 13. She complains about the following statements:

| | |
|---|---|
| MR. THIMSEN: | Well, you've got Jordan McCaskill; a college graduate, fitness trainer, assumes extra duties with his department, family man, gets a Medal of Valor for jumping into a burning car, saving -- |
| MR. RAMSTAD: | Objection. Judge of character. |
| THE COURT: | Overruled. But move on. |
| MR. THIMSEN: | For saving somebody he doesn't know. He's gotten other commendations. |

Jordan Hansen, he's been recognized. He serves without blemish, without problem. Think about it. If he had a bad record, if he was a bad cop, you don't think the State of Iowa does a background investigation that determines what kind of people? What? Five out of 900 people applied for the job he now holds?

Justina Hilmoe, 13 years. Goes through college. Gets her degree. Works her way up from patrolman, to Sergeant, to Lieutenant, the highest I'm going to call it a street rank, before you get into administration. Married, with a family.

\*\*\*

> I think I'm going to hold off before I go in there, because I can't risk another lawsuit." Are they going to say there's maybe another person in a burning car and say, "Not today, not today. Been down that road."
>
> \*\*\*
>
> The collective years of law enforcement here, and no evidence they've had one blemish on their record.

(Doc. 81 at p. 11-12; TT 401, 407-409.)

With certain exceptions not applicable here, Federal Rule of Evidence 404 prohibits the introduction of character evidence to prove that on a particular occasion the person acted in accordance with the character or trait. The Court first notes that Welbig did not object to the bulk of the background or character evidence when it was introduced at trial.[2] For example, counsel did not object when McCaskill testified that he received the Medal of Valor "for pulling a young man from a burning vehicle that was involved in an injury accident on the highway." (TT 272.) Three more questions were asked by defense counsel about that incident before Welbig's counsel objected to further discussion of the circumstances, and the objection was sustained. (TT at 273.) Welbig's lawyer objected once during closing when defense counsel referred to McCaskill's Medal of Valor for saving a man from a burning vehicle. (TT 401.) Although the Court overruled the objection, it directed defense counsel to "move on." (*Id.*) As stated in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238-39 (1940): "In the first place, counsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial."

Even if character evidence was erroneously admitted, the erroneous admission of evidence does not warrant a new trial unless the cumulative effect of the errors is to substantially influence

---

[2]Welbig did not object to any of the background questions defense counsel asked of Hilmoe. (TT 233:11 - 235:3.) Welbig's counsel objected to only a few follow-up questions from defense counsel to McCaskill and Hansen. The Court sustained those objections. (TT 272:8 - 273:16, 301:22-23, 317:12-25.) If there had been objections to the other character evidence, the Court would also have sustained those objections.

12

the jury's verdict. *Williams v. City of Kansas City, Missouri*, 223 F.3d 749, 755-56 (8th Cir. 2000). In this case, the jury's verdict was safeguarded from any character evidence admitted during trial by carefully worded instructions which directed the jury how to decide the case. A preliminary instruction that the Court read to the jury before the trial started states, in part:

> In deciding what testimony to believe, consider the intelligence of the witness, the opportunity the witness had to see or hear the things testified about, the memory of the witness, any motives the witness may have for testifying a certain way, the manner of the witness while testifying, whether the witness said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with other evidence that you believe.
> Do not allow sympathy or prejudice to influence you. The law demands of you a just verdict, unaffected by anything except the evidence, your common sense, and the law as I give it to you.

(Doc. 45, Preliminary Instruction No. 3.) The Court must assume the jury followed the instructions because there is no evidence to the contrary. *See United States v. Johnston*, 353 F.3d 617, 623 (8th Cir. 2003) (referring to a curative instruction).

Welbig's main complaint here is that defense counsel used character evidence during closing argument. Misconduct of counsel may be grounds for new trial, but the Court must judge whether there has been an effect on the substantive rights of the parties, or whether the misconduct created undue prejudice or passion tainting the proceedings, particularly in light of whether the district court concludes that an effective curative instruction has been given. *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 385 (8th Cir. 1992). After presiding over the trial and reviewing the record again for purposes of this motion, this Court finds no statements made by defense counsel in closing so prejudicial as to require a new trial in this case. In addition, the horse was already out of the barn. No objection was made during presentation of evidence to almost all of the character questions, so that evidence was before the jury without objection. The objection then first made in final argument was too late.

Furthermore, a preliminary instruction read to the jury before trial states, in part:

> After presentation of evidence is completed, the attorneys will make their closing arguments to summarize and interpret the evidence for you. As with opening

statements, closing arguments are not evidence. I will then instruct you further on the law. After that you will retire to deliberate on your verdict.

(Doc. 45, Preliminary Instruction No. 10.) A final instruction that was read aloud and then given in writing to the jury prior to deliberations explains that arguments of the lawyers are not evidence. It provides, in part:

> As I stated earlier, it is your duty to determine the facts, and in so doing you must consider only the evidence I have admitted in this case. "Evidence" includes the testimony of witnesses, documents and other things received as exhibits, any facts that are stipulated – that is, formally agreed to by the parties – and any facts that are judicially noticed – that is, facts which I say you may, but are not required to, accept as true, even without evidence.
>
> Certain things are not evidence. I will list those things for you now:
>
> 1. Statements, arguments, questions and comments by lawyers representing the parties in the case are not evidence.

(Doc. 48, Instruction No. 3.) This Court believes the jurors were able to separate the lawyers' arguments from the evidence and follow what the Court told them to do in its instructions.

Finally, even if it was improper for defense counsel to refer to the defendants' good character during closing argument, Welbig has not established that the verdict was the result of that argument as opposed to admissible evidence that was simply unfavorable to her case. For all of these reasons, the Court does not find that Welbig was prejudiced by defense counsel's references to character in closing argument, or that the character evidence calls the fairness of the verdict into doubt. Thus, the motion for new trial made on this ground will be denied.

### C. Motion for Evidentiary Hearing on Potential Juror Misconduct

Welbig does not claim that she should receive a new trial on this ground. Rather, she seeks an evidentiary hearing to look into whether Juror #12, who was employed as a scheduler at the Brookings Medical Clinic, may have presented extraneous evidence concerning Welbig's medical history to the jury. Welbig admits she does not know if the jury was exposed to any extraneous

information. *See* Doc. 83 at 3 ("[I]t is not known in this case whether the jury considered extraneous matters.").

A district court has broad discretion in handling allegations of juror misconduct. *See United States v. Williams*, 97 F.3d 240, 246 (8th Cir. 1996); *see also United States v. Vig*, 167 F.3d 443, 450 (8th Cir. 1999) ("[W]e find no abuse of the district court's discretion in denying [defendant] a new trial or an evidentiary hearing" about evidence of juror misconduct.). The Second Circuit has stated that courts should hesitate "to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983). As the Supreme Court has noted, "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct." *Tanner v. United States*, 483 U.S. 107, 120-21 (1987). A post-trial hearing is not required whenever a party claims that extraneous evidence tainted their trial; rather, "a trial court is required to hold a post-trial jury hearing only when reasonable grounds for investigation exist. Reasonable grounds are present when there is clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *Id.* (citation omitted). The Eighth Circuit has stated that the more speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate. *See United States v. Tucker*, 137 F.3d 1016, 1031 (8th Cir. 1998) (quoting *United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir. 1985)). "A district court's investigation of juror misconduct or bias is a delicate and complex task." *United States v. Peterson*, 385 F.3d 127, 134 (2d Cir. 2004) (citing *United States v. Cox*, 324 F.3d 77, 86 (2d Cir. 2003)). The trial court has broad flexibility, especially when the alleged prejudice results from statements by the jurors themselves, rather than from the media or other outside influences. *Id.* (citing *Cox*, 324 F.3d at 86).

In support of her allegation that the jury may have considered extraneous information during deliberations and that an evidentiary hearing should be held, Welbig submitted her own affidavit stating in relevant part:

15

> The first call which came to my home phone on July 1, 2016 was from a female identified on my phone as "private caller" who stated that a girl from Elton had all my information and shared it with the jury that I do drugs and that I drink. She stated that "this was a joke" and that the jury would be insane to side with me because I only wanted money. She stated that there was a note in my medical record that I was just seeking drugs. The caller would not identify herself.

Doc. 84 at ¶ 6.[3] Welbig does not say what time she received the call on July 1, 2016. The jury verdict was issued around noon that day. *See* Doc. 55 at 6. Welbig admits she recognized Juror #12 during voir dire. *See* Doc. 84 at ¶¶ 2,3. Welbig asserts that since the trial she has confirmed that Juror #12 is employed as a receptionist at Brookings Medical Clinic and that she has access to Welbig's medical records at the clinic. *See id.* at ¶¶ 10, 11.

The Court is troubled by the timing of the motion for an evidentiary hearing based on potential jury misconduct. The motion was not filed until November 18, 2016. *See* Doc. 82. It is not clear why Welbig waited over four months after the verdict was returned to raise the allegations of juror misconduct if she recognized Juror #12 during voir dire, and if she received the anonymous phone call the day the verdict was returned on July 1, 2016. The Supreme Court has said that "[a]llegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process." *Tanner*, 483 U.S. at 120.

The quality and sufficiency of the evidence submitted in support of the motion is also troubling. The allegation of misconduct came from an anonymous caller to Welbig on July 1, 2016. There is nothing to suggest the anonymous caller's identity. This is unreliable. There is no affidavit of a juror, and there is no allegation that a juror has been interviewed or has stepped forward to talk about a potential external influence on the jury. It is pure speculation that extraneous information reached a juror. This is not the clear, strong, substantial and incontrovertible evidence of a prejudicial

---

[3] Welbig also attests that she received a second anonymous call on July 13, 2016, with the caller saying an officer named Joey Collins was at the scene of her arrest and was wearing plain clothes, but this information does not appear to be relevant to Welbig's juror misconduct claim. Doc. 84 at ¶ 8.

impropriety that would require a jury hearing. The allegations of juror misconduct that have been presented by Welbig's affidavit do not merit a hearing to question the jurors regarding their deliberations in this case. *See, e.g., Caldwell*, 776 F.2d at 999 (district court properly handled allegation of juror misconduct by questioning the allegedly offending juror outside presence of lawyers and parties after anonymous telephone call to defense counsel and to chambers; the anonymity of the call "simply creates no burden to investigate," particularly "when the court has no basis whatsoever to adjudge the reliability of the initial accusation.").

Furthermore, whether Welbig drinks or seeks and does drugs has nothing to do with the liability issues in this case, *i.e.*, whether the defendants' actions violated Welbig's civil rights, which makes the Court hesitate even more to bring the jurors in for questioning when sufficient evidence exists to support the verdict in this case. The jury was instructed to decide the case based solely on the evidence presented, and there is no reason to doubt that the jury based its decision only on evidence formally presented at trial.

## CONCLUSION

There is a legally sufficient basis for the verdict rendered by the jury, and Welbig's substantial rights were not prejudiced by the closing argument at trial. Additionally, Welbig's allegations of juror misconduct do not warrant an evidentiary hearing. Accordingly,

IT IS ORDERED that Plaintiff's Motion for New Trial (doc. 65) and Motion for Evidentiary Hearing (doc. 82) are denied.

Dated this 14th day of February, 2017.

BY THE COURT:

*[signature]*
Lawrence L. Piersol
District Court Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: *[signature]* Deputy